**FOSTER METAL PRODUCTS, Inc.,**
Defendant, Appellant,

v.

**JACOBY–BENDER, Inc., Plaintiff,**
Appellee.

No. 5311.

United States Court of Appeals
First Circuit.

June 4, 1958.

L. William Bertelsen, III, Boston, Mass., with whom Herbert P. Kenway and Kenway, Jenney, Witter & Hildreth, Boston, Mass., were on brief, for appellant.

Harold James, New York City, with whom James & Franklin and Roberts, Cushman & Grover, Boston, Mass., were on brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

The litigation here is a typical patent infringement suit. It was commenced by the filing on August 23, 1956, in the court below by Jacoby-Bender, Inc., appellee herein, of a complaint against Foster Metal Products, Inc., the present appellant, charging infringement by defendant of the single claim in the so-called MacIntosh patent, U.S. Letters Patent No. 2,249,086. The prayer of the complaint was for an injunction and damages.

After hearing, the district court entered its Final Judgment and Interlocutory Decree on September 24, 1957, which, after declaring that the claim sued on was valid and infringed, decreed that a permanent injunction issue restraining the defendant from further infringement of the claim, and ordered that plaintiff recover damages in an amount to be determined by a master. Appeal was taken from this judgment.

Involved in the case is a detachable feature in wrist watch and identification bracelets, superimposed upon a type of bracelet long known in the industry and referred to as having a "lazy tongs" linkage. The lazy tong is in the shape of an abbreviated "S". The linkage is comprised of a pair of top and bottom links pivotally connected to each other at their centers, all four ends being pivotally connected to the ends of adjacent links. A spring is usually placed inside the central pivotal connection between each pair of links, causing the links to pivot relative to one another, and thus it aids in permitting a certain elasticity in the size of the bracelet. The foregoing explains the type of linkage in which the claimed invention is found but does not describe the invention itself.

The lazy-tongs wrist band has been known for over fifty years and has been used as a wrist watch bracelet since the latter part of World War I. The expansibility feature of this type of bracelet enables the wearer to stretch it when taking it off or putting it on his wrist. However, it is necessary that the bracelet be the proper size to fit the particular wrist, as the expansion feature does not accomplish adjustment to wrists of different sizes. It became evident that it was desirable to develop a detachable feature in the linkage, so that by the easy addition or subtraction of links the size of the bracelet could be adjusted to the varying thicknesses of the wrists of the wearers. In the absence of such a detachable feature, retailers were obliged to carry an inventory sufficiently large to meet all wrist sizes in all designs. The problem of the retailer was

even more acute when it came to the sale of a watch as a unit with an attached bracelet. If the retailer offered a watch which the customer desired but the bracelet did not fit, the retailer might well lose the sale of the watch unless he could persuade the customer to take a wrist band not so well matched to the design of the watch. If the customer could not thus be persuaded, the retailer had at least to undergo the inconvenience of writing the manufacturer for the proper-sized band.

This need for a detachable feature whereby one band could be adjusted to fit all wrists was manifest as early as 1891 when Magerhans Patent No. 447,-692 was issued. In fact the president of defendant company, William C. Boots, in 1925 and again in 1928 acquired patents on a linkage with this detachable feature.

On July 15, 1941, the patent in suit was issued to Charles L. MacIntosh, describing an expansible X-type lazy-tongs bracelet having detachable links.

Though the MacIntosh patent was eventually assigned to the plaintiff-appellee herein, MacIntosh did for a number of years manufacture detachable bracelets in accordance with the teaching of the patent. But his scale of production was small, some 40,000 bracelets. While MacIntosh made a small profit on this operation, he nevertheless found it unfeasible to continue production and returned to making the conventional nondetachable lazy-tongs bracelet, though, if it were important to know, it is a fact that he went into the red in making this shift back.

Of course commercial success, or lack of it, is only one of the indicia on the issue of invention, and the value of this factor can be easily overstressed. The plaintiff contends that the reason MacIntosh was not more successful in the production of detachable bracelets was undercapitalization, which resulted in too low a scale of production. Defendant, on the other hand, maintains that the reason lay in the faulty nature of the claimed invention, which permitted the bracelet accidentally to fall apart under ordinary use. The district judge, however, adopted the explanation that production by one small producer was not sufficient to cause salesmen to learn how to manipulate the detachable linkage of the bracelet; and that the production costs of a detachable bracelet were somewhat higher, though the selling price to the retailer, due to the absence of a campaign of education, was no higher than that of the conventional bracelet. Reasons of this sort were thought by the district court to account for the return by MacIntosh to the manufacture of the more conventional style of bracelet. The court thought the assertion to be an exaggerated one that the MacIntosh bracelets were inclined to come apart accidentally in normal usage, a finding that we are disposed to think is correct after the difficulty we ourselves have experienced in attempting to achieve the accidental detachment of the tongs by casual manipulation of the bracelet.

In 1945 MacIntosh gave a license under his patent to the Howard Manufacturing Company, which made a detachable bracelet for a period of some six months.

In 1954 MacIntosh assigned his patent to the plaintiff herein, Jacoby-Bender, Inc. Subsequently, the plaintiff began production of a detachable bracelet. Its commercial model was not, however, identical with the teachings of the MacIntosh patent. Plaintiff's engineers had developed a safety factor which required an additional manipulation in order to enable the bracelet to come apart. This modification, described as a "Separable Bracelet Linkage With Means For Preventing Accidental Separation", was patented on October 9, 1956, in a patent issued to N. C. Burkhardt and assigned to plaintiff, Jacoby-Bender, Inc.[1]

1. In support of its contention that the detachable bracelet described in the Mac-Intosh patent was unworkable, appellant makes much of a statement contained

The defendant having decided to re-engage in the production of a detachable bracelet, its president, Boots, designed another modification of the MacIntosh patent, and filed a patent application therefor in December, 1955, which was granted on January 1, 1957, as Patent No. 2,775,862. The district court, after noting that the Boots application did not cite the MacIntosh patent, correctly concluded that the issuance of the patent to Boots did not create a presumption that the structure described in the Boots patent was not an infringement of the earlier MacIntosh patent. Temco Electric Motor Co. v. Apco Mfg. Co., 1928, 275 U.S. 319, 48 S.Ct. 170, 72 L.Ed. 298.

Plaintiff's new product, with the Burkhardt adaptation, was launched with a substantial advertising campaign and met with great success. Plaintiff converted 30 of its 33 X-type bracelets to the detachable feature in answer to the demands of retailers. The extent of this demand for plaintiff's new product is indicated by the fact that, in a two-year period from 1954 to 1956, plaintiff's production of detachable bands amounted to 3,368,000. Plaintiff has also given three licenses to manufacturers under the MacIntosh patent.

We discuss now in more detail the patent sued on, the single claim in which reads as follows:

"A link chain construction comprising a lazy-tong arrangement of pivotal link members, the ends of certain of the link members being provided with laterally disposed and headed studs, the ends of complementary link members being formed with keyhole-shaped openings for receiving the headed studs and pivotally connecting the ends of the link members together, the keyhole-shaped openings in form having a circular opening and a narrow slot extending therefrom, the narrow slots extending from the circular openings outwardly toward the terminals of the link members and normally receiving the neck portions of the headed studs."

As above stated, all bracelets with the X-type linkage contained top links and bottom links connected at their centers. The bottom links have headed studs projecting from the base plate, outwardly at right angles to the plane of the links. The studs are positioned near each end of the bottom link. The base plates of the top links are provided with slots near the ends of the upper links. These slots are adapted to reach the studs from the bottom links.

Thus far nothing has been described but the conventional lazy-tong arrangement. Proceeding with the specifications contained in the patent, the slots run in a lengthwise direction along the top link and are shaped in a keyhole design. The narrow portion of the keyhole is large enough for the shank of the stud to pass through but too narrow to enable the passage of the head of the stud. The head can only pass through the large circular portion of the keyhole which, though near the end of the upper links, is nevertheless nearer the center of the links than the narrower portion of the slot. The narrower portion points at an angle so the longitudinal or lengthwise direction of the link and is nearer to the

in Burkhardt's application for a patent: "In order to evaluate the improvement, it is necessary to appreciate the problems which the MacIntosh linkage presents. . . . [I]t quite often occurred that the headed studs in the MacIntosh linkage would approach the enlarged ends of the slots and often would escape from those enlarged ends even when the bracelet was being subjected to normal use. This, of course, is inadmissible from a commercial point of view." Though the foregoing statement was properly treated as an admission on the plaintiff's part, the district judge regarded it as due to the zeal of a patent attorney, and did not think that accidental separation of the MacIntosh linkage could have presented a really serious problem. The Patent Office examiner was not impressed with this particular contention in the Burkhardt application and thought that an accidental detachment in the MacIntosh bracelet could be caused only by some outside unexpected force.

end of that link. This angular design as well as the location of the narrow base of the keyhole prevents disengagement when the band is in a normal position. The stud is forced into the narrow segment of the keyhole when the bracelet is either contracted or expanded.

Thus the inventor has applied the slot keyhole device in a manner which enables the resolution of forces continually to impel the stud to remain in the narrow portion of the slot. It is this placement of the keyhole device in a lazy-tong arrangement and its underlying utilization of the resolution of forces that constitutes the patentable idea.

Appellant seems disturbed by the fact that the district court in a rather brief opinion fails to quote the exact language of the claim. But there is no reason to suppose that the court was unfamiliar with the claim. It is true, the court said in its opinion: "The commercial production of MacIntosh in its basic state for some seven years demonstrates its practicality. I have no difficulty in finding invention. The ready detachability without tools due to the angular location of keyholes and the holding of the studs in place by the action of the springs while serving their other, and principal purpose, was a substantial novelty, and a useful one." We do not read this statement as evincing a misapprehension on the court's part that the insertion of springs, which were old in the art, constituted part of the invention. We say this because the district court, earlier in its opinion, recognized and stated that the "sole novelty was the method of detachability of the links."

Nor is it fair to say that the district court ignored the teachings of the prior art which had been cited to it. In this connection, it commented specifically upon Magerhans Patent No. 447,692 and Surrows Patent No. 2,172,525.

The Magerhans patent, which described a detachable bracelet, was not successful in commercial production; in fact, the Magerhans method was at one time experimented with by the defendant and discarded. Detachability was accomplished in a way not remotely analogous to that used by MacIntosh. In Magerhans, tiny threaded tubes into which small screws were inserted were the means of holding the links together, and to detach a link required unscrewing the small screws which, because of their size, was not easily done. The trial judge properly disposed of this point by saying:

"In . . . Magerhans #447,-692, detachability was effected by removable screws. I am satisfied that, due to the necessarily small size of bracelet links, Magerhans was difficult, or at least expensive, to manufacture, and impractical for the primary purpose to which the detachability feature was addressed. . . . The most desirable bracelet is one that can be adjusted readily by a salesman at the moment of the sale, so that several sizes need not be carried. Facility in the rapid handling of jeweler-size screws in order to add or subtract links is not to be expected of all salesmen, and even a jeweler doubtless would not like the bother."

In the Surrows patent, Surrows did make use of a keyhole slot and headed stud. However, the keyhole slot was parallel to the direction of the chain and not at an angle, as in the MacIntosh patent wherein the placement of the narrow section of the slot at an angle with the direction of the chain forces the stud to remain in the narrow position of the slot. In Surrows the stud remained in the narrow portion of the keyhole only because of a keeper. The keeper was necessary inasmuch as the narrow portion of the slot extends toward the side of the link and in the direction of the chain, which means that on the pulling of the chain the stud is forced into the round portion of the keyhole and would consequently detach but for the keeper. For the teaching of Surrows to prevent the MacIntosh idea from being patentable would require a ruling that the novelty of Mac-

Intosh's device was the keyhole slot and not the manner in which the slot was oriented.

We refer briefly to two other prior patents which appellant mentions in its brief.

In the Doerr patent, No. 99,298, when the linkage is assembled the stud remains in the broadest segment of the slot, unlike MacIntosh. Moreover, the angle of the slot is the same as in Surrows, i. e., parallel to the direction of the chain. It is therefore subject to pressure on both the contraction and expansion of the chain. The means used to prevent this pressure from causing the chain to disengage is the peculiar arrowhead-like shape of the stud. For it to be removed, it must be turned ninety degrees so as to be perpendicular to the slot and parallel to its lengthwise direction. This method of disengagement is entirely dissimilar to that in MacIntosh, the reason being that it required the individual links to be moved independently. The tongs in the MacIntosh patent are connected in all four corners and cannot be moved independently. The Doerr device could not be used in a lazy-tong bracelet with its expansible feature.

In the Brough patent, No. 245,780, the slot is again oriented in the direction of the chain's contraction and expansion. In order for disengagement to occur, one chain link must be at a right angle to the other, which is required because of a stop or projection preventing the passage of the stud along the narrow portion of the slot. The stud is cut away on one side, and consequently, when the links are in proper relation, because of the cut-off segment the stud misses the top or projection and thus can proceed toward the circular portion of the keyhole.

In an effort to discount the undoubted commercial success achieved by plaintiff Jacoby-Bender, Inc., in the exploitation of its device, appellant argues that this success was not attributable to the MacIntosh bracelet, but rather to the Burkhardt adaptation. But the district judge found, on adequate evidence, that the pure MacIntosh bracelet was workable and that, had it been excessively subject to accidental coming apart, it would not have lasted on the market for seven years before MacIntosh returned to the more conventional production.

The district court's conclusion that the patent in suit is valid seems to follow a fortiori from our holding in Ellis, Inc., v. Denis, 1955, 224 F.2d 311, because, inserting the keyhole slot for the first time into a lazy-tong bracelet in the manner described by MacIntosh, to provide detachability, resulted not only in a new function but supplied also the answer to a long-felt need.

On the issue of infringement, it must be recalled that the defendant is charged with infringing only the MacIntosh patent, not also the Burkhardt adaptation.

The accused structure, as described in Boots patent No. 2,775,862, does not make use of a keyhole slot. It does have the conventional upper and lower links connected in lazy-tong fashion. Each bottom link is provided at each end with a stud having a cylindrical shank and a flat disc-shaped head. These studs extend from the links at a right angle with the plane of the link. Each of the top links is provided with a pair of slots adjacent to its ends into which the headed studs are received. The slot is comprised of a narrow portion through which the shank of the stud can pass but not its head. There is also a widened portion, called a slit, through which the head can pass. The slit replaces the circular segment of the keyhole and its function. Similarly to MacIntosh, the narrow portions of the slot are closer to the ends of the top links than the enlarged or widened slit.

The slit through which the stud head can pass, thus enabling disengagement, is formed by first slicing the base plate adjacent to the inner end of the narrow slot portion. The slit is considerably wider than the narrow portion of the slot. Thus the material is bent upwardly and downwardly so as to produce an elliptically shaped opening wide enough for the stud head to pass through.

The difference between the MacIntosh and Boots linkages lies in the difference between the circular part of the keyhole and the slit in the Boots device, which is placed at an angle with the plane of the link. For disengagement to occur in Boots requires one extra motion, that of bending backward the links to enable the stud head to pass through the slit, which, as mentioned, is at an angle with the plane of the link. Unlike MacIntosh, the fact that the stud may occasionally move to the wider portion of the slot is unimportant.

It seems that Boots should not be entitled to make anything of his not using a circular keyhole shape, since if the circular part of the keyhole were made into a square, infringement would be clear enough despite the absence of a keyhole shape in the offending device.

The basic aspects of the MacIntosh structure remain unchanged in Boots. For example, the narrower segment of the slot extends from the wide portion toward the terminals of the link member. It is this orientation of the slot within the link that requires the stud to remain in the narrow portion of the slot under the varying resolution of forces. A second similarity is the use of a narrow slot and a large opening. Appellee's position is well summarized in the following quotation from the district court's opinion [152 F.Supp. 291]:

> "Boots is substantially identical to MacIntosh except that for the larger circular openings through which the heads of the studs pass there is substituted a slot on an inclination of some 10%. This change of plane makes the actual opening a flattened ellipse instead of a circle, but in a way this is simply a matter of appearance. Because the opening is inclined to the lateral plane of the bracelet, only part of the conceptual circle intersects the existing metal. There still would be essentially a circular opening if the metal were thicker."

It can be said that, despite the similarity of the two linkages, the substitution of a slit for a keyhole-shaped slot does succeed in avoiding the literal wording of the claim in suit and consequently cannot be said to be a literal infringement of the claim. This being so, it would appear that the case must be disposed of on the basis of the applicability of the doctrine of equivalency.

■ No longer can it be contended that this doctrine is applicable only where the substituted element in the combination was known to the trade as an equivalent at the time when the patent was issued. See Finkelstein v. S. H. Kress & Co., 2 Cir., 1940, 113 F.2d 431; Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 2 Cir., 1957, 247 F.2d 343, 350; Waterproof Insulation Corp. v. Insulating Concrete Corp., D.C.D.Md. 1957, 153 F.Supp. 626, 631; 3 Walker on Patents § 465 (Deller's ed. 1937).

Appellant contends that the alleged invention in the MacIntosh patent is not of the type that deserves a broad reading of the claim, and suggests apparently that any minor alteration of MacIntosh should be considered of sufficient novelty to avoid the charge of infringement, especially in view of the fact that Boots overcame a flaw which the plaintiff admitted to exist in the MacIntosh device at the time the plaintiff applied for a patent on the Burkhardt adaptation.

■ However, the district court found that the MacIntosh bracelet was commercially feasible, and it would appear that Boots is so close to the patent in suit that it could be considered to be a change in form only, an area in which the doctrine of equivalency is most readily applied. See Winans v. Denmead, 1853, 15 How. 330, 56 U.S. 330, 14 L.Ed. 717; Sanitary Refrigerator Co. v. Winters, 1929, 280 U.S. 30, 50 S.Ct. 9, 74 L. Ed. 147. But, inasmuch as this change in form does constitute some improvement of the function described in the MacIntosh patent, it would seem better to say that appellant did not achieve sufficient novelty merely by placing the circular aspect of MacIntosh's keyhole on a ten-degree angle, causing it to lose its circular appearance and look elliptical.

A substitution for, or addition to, a previous combination of elements does not escape the charge of infringement merely because it brings about some improvement in function. See 3 Walker on Patents § 459 (Deller's ed. 1937).

A judgment will be entered affirming the judgment of the District Court.